**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NEIL DORFMAN, TRAVIS CORBY,
CHAD HOBSON and ALLEN DAVIS
individually and on behalf of all others
similarly situated,

               Plaintiffs,

    v.

FORD MOTOR COMPANY, a Delaware
Corporation,

               Defendant.

Case No.:

**JURY TRIAL DEMANDED**


<u>**CLASS ACTION COMPLAINT**</u>

# TABLE OF CONTENTS

*Page*

I     INTRODUCTION ..................................................................................1

II    JURISDICTION AND VENUE ...........................................................4

III   PARTIES ..............................................................................................5

    A.    Plaintiffs ...................................................................................5

         **1.**   Travis Corby ..................................................................5

         **2.**   Chad Hobson ..................................................................8

         **3.**   Allen Davis ....................................................................9

         **4.**   Neil Dorfman ...............................................................11

    B.    Defendant ...............................................................................12

IV   FACTUAL ALLEGATIONS .............................................................14

    A.    Background .............................................................................14

    B.    The Camera Defect..................................................................17

    C.    Ford Pursues Three Ineffective Recalls for the Camera Defect .........19

         **1.**   Permanent Damage Caused by the Failed Recalls ...................24

    D.    Ford Has Long Been Aware of the Camera Defect and Is Aware that

        It Persists ...............................................................................24

V    CLASS ALLEGATIONS ...................................................................34

i

**TABLE OF CONTENTS (cont.)**

*Page*

VI    CLAIMS FOR RELIEF ...................................................................38

    A.    Claims on Behalf of the National Class or, in the alternative,

        the State Subclasses.................................................................38

             COUNT I:  VIOLATION OF THE MAGNUSON-MOSS

                WARRANTY ACT .......................................................38

             COUNT II: FRAUDULENT OMISSION ................................43

             COUNT III: BREACH OF CONTRACT.................................45

             COUNT IV: UNJUST ENRICHMENT ..................................48

    B.    Claims Brought on Behalf of the Michigan Subclass ........................49

             COUNT V: VIOLATION OF THE MICHIGAN

                CONSUMER PROTECTION ACT ..............................49

             COUNT VI: BREACH OF THE IMPLIED WARRANTY

                OF MERCHANTABILITY............................................54

             COUNT VII: BREACH OF EXPRESS WARRANTY ...........57

    C.    Claims Brought on Behalf of the California Subclass ........................62

             COUNT VIII: VIOLATIONS OF THE CONSUMER

                LEGAL REMEDIES ACT ("CLRA") ...........................62

**TABLE OF CONTENTS (cont.)**

*Page*

COUNT IX: BREACH OF IMPLIED WARRANTY
PURSUANT TO THE SONG-BEVERLY
CONSUMER WARRANTY ACT ..................................66

COUNT X: BREACH OF EXPRESS WARRANTY ..............69

D.  Claims Brought on Behalf of the Kentucky Subclass ........................75

COUNT XI: BREACH OF IMPLIED WARRANTY .............75

COUNT XII: BREACH OF EXPRESS WARRANTY ...........79

VII  PRAYER FOR RELIEF ................................................................85

## CLASS ACTION COMPLAINT

Plaintiffs Travis Corby, Neil Dorfman, Chad Hobson, and Allen Davis, on behalf of themselves and on behalf of proposed nationwide and statewide class, bring this action against Defendant Ford Motor Company ("Ford"), by and through their attorneys. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on information and belief, including the investigation of counsel:

## I    INTRODUCTION

1.    This Complaint seeks damages against Ford for breach of the manufacturer's warranty and for unfair and deceptive practices pertaining to its design and manufacture of 2020-2023 Ford Explorer, 2020-2023 Lincoln Aviator, and 2020-2023 Lincoln Corsair vehicles outfitted with a 360-Degree Camera system (the "Class Vehicles").

2.    This action arises from Ford's concealment of latent defect(s) in the Class Vehicles' 360-Degree Camera system causing glitches, blue or black screens, and camera failures, rendering the Class Vehicle's Camera inoperative (the "Camera Defect").

3.    Most backover fatalities and injuries involve passenger vehicles. In fact, in a 2008 study, the United States Department of Transportation reported that more than 200 people are killed and over 12,000 more are injured each year as a

1

result of = backover crashes. The report confirmed that children under 5 years old and adults 70 and older are at an elevated risk of being backover victims. The report also notes that while backover injuries and fatalities happen in a variety of areas, they most commonly occur in driveways, other residential areas, public roadways, and nonresidential parking lots.[1]

4.     On February 28, 2008, President Bush signed into law the Cameron Gulbransen Kids Transportation Safety Act of 2007, which expanded the required driver's field-of-view behind vehicles to reduce deaths and injuries from backup crashes, especially crashes involving small children.[2] The additional safety mandated by the Act directed the National Highway Traffic Safety Administration ("NHTSA") to oversee the implementation of safety measures requiring automakers to have standard backup cameras in all vehicles.

5.     Thereafter, beginning in May 2018, Federal Motor Vehicle Safety Standard 111 began requiring that all new cars in the United States be equipped with a backup camera.

---

[1] Fatalities and Injuries in Motor Vehicle Backing Crashes: Report to Congress, NHTSA Technical Report DOT HS 811 144, available at: https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811144.pdf [last accessed September 10, 2023], attached hereto as **Exhibit 5**.
[2] Cameron Gulbransen Kids Transportation Safety Act of 2007, PL 110-189, February 28, 2008, 122 Stat 639.

6.      Although Ford equips its Class Vehicles with 360-Degree Cameras, the Camera Defect causes output failures, preventing the rear-view camera image from properly displaying, thus rendering the backup camera utility non-functional. In fact, as NHTSA reported in its Part 573 Safety Recall Report 21V-735, "[o]nce present, the issue will likely reoccur on the same camera(s) intermittently".[3]

7.      Ford manufactured, marketed, distributed, sold and/or caused to be sold or leased the Class Vehicles to consumers, including Plaintiffs, without disclosing the Camera Defect, a safety defect that Ford still has yet to properly remedy.

8.      Significantly, this Camera Defect poses a safety risk to operators and passengers of the Class Vehicles because the loss of the rear camera image while in reverse increases the risk of a crash.[4] This exposes drivers and occupants of the Class Vehicles, as well as others sharing the road with them, including pedestrians, to increased risk of accident or injury. As discussed further herein, numerous owners and lessees of the Class Vehicles have experienced the Camera Defect while operating Class Vehicles, thus placing themselves and those around them at an increased risk of crash and injury.

---

[3] NHTSA Part 573 Safety Recall Report 21V-735, September 23, 2021, https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V735-6073.PDF [last accessed September 10,, 2023], attached hereto as **Exhibit 6**.
[4] *Id.*

9.     As a result of Ford's unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in vehicle value.

10.    As a result of the Camera Defect and Ford's continued inability to remedy the safety defect, Plaintiffs and the Class members have suffered injury in fact, incurred damages, and have been otherwise harmed and continue to be harmed by Ford's conduct.

## II    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.    This Court has specific personal jurisdiction over Defendant Ford because it is headquartered in Dearborn, Michigan. Ford has purposefully availed itself of the benefits and protections of the State of Michigan by continuously and systematically conducting substantial business in and from this judicial district, directing advertising and marketing materials to districts within Michigan, and

intentionally and purposefully placing the defective Class Vehicles into the stream of commerce within Michigan, and throughout the United States, with the expectation and intent that consumers throughout the United States would purchase them. Thousands of defective Class Vehicles have been sold in Michigan and across America and are operated within this State and this judicial district.

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Ford transacts business in this judicial district, is subject to personal jurisdiction in this judicial district, and therefore is a citizen of this judicial district. Additionally, there are one or more authorized Ford dealers within this judicial district, Ford has advertised in this judicial district, and Ford has received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this judicial district; therefore, a substantial and material part of the events and/or omissions giving rise to the claims occurred within this judicial district.

### III    PARTIES

**A.    Plaintiffs**

**1.    Travis Corby**

14.    Plaintiff Travis Corby is a resident of Los Angeles, California.

15.    In December 2020, Mr. Corby leased a new 2020 Lincoln Aviator, VIN 5LM5J7XC7LGL03714 (for purposes of this section "the Vehicle"), from South Bay Ford Lincoln, an authorized Lincoln dealership in Hawthorne, California.

16.     Mr. Corby uses the Vehicle for personal, family, and/or household uses.

17.     Prior to leasing the Vehicle, Mr. Corby spoke with one or more sales representatives at South Bay Ford regarding the various features, benefits, and attributes of the Vehicle and relied on those when deciding to lease the vehicle. None of the sales representatives informed Mr. Corby of the latent and dangerous Camera Defect. Moreover, neither Lincoln or its representatives informed Mr. Corby of the Camera Defect prior to, or any time after, he leased his Vehicle.

18.     Within his first two years leasing the Vehicle, Mr. Corby experienced the Camera Defect while in reverse for the first time. The Vehicle had approximately 9,000 miles at the time.

19.     Mr. Corby presented the Vehicle to both South Bay Ford and Santa Monica Lincoln Ford on multiple occasions for software updates and repairs of the Camera Defect, all to no avail. Mr. Corby also called the service departments at both dealerships on numerous occasions to check on the status of an appointment for repair of the Camera Defect, but he was told that scheduling an appointment would be pointless because Lincoln had not yet come up with a solution to the Camera Defect.

20.     Mr. Corby then raised his complaints about the Camera Defect with Lincoln Financial and Lincoln Concierge Services, but the Camera Defect persists. Mr. Corby asked that Lincoln take back the vehicle due to the defects, but he was

told that Lincoln would not offer that option. His vehicle currently has approximately 18,000 miles.

21.     Despite attempted updates and repairs to the Vehicle, Mr. Corby still intermittently experiences the Camera Defect when he places his vehicle in reverse. When the Camera Defect occurs, the Vehicle's reverse brake assist also spontaneously glitches and engages, thus bringing the vehicle to an abrupt stop for no apparent reason. Indeed, had Mr. Corby known of the Camera Defect, he would not have leased the Vehicle or would have paid substantially less for it.

22.     In July 2023, Mr. Corby received a Letter Notice of safety recall 23S23, noting that Ford currently does not have a permanent fix available for the Vehicle's Camera Defect.

23.     As a result of the safety concerns, Mr. Corby decided it was no longer safe for him or his family to drive the vehicle. In July 2023, Mr. Corby purchased a replacement vehicle. He then attempted to either turn in his vehicle early to Lincoln or sell the vehicle, but he was told that due to the recall associated with his VIN number, the car could not be disposed until the recall was lifted. Mr. Corby then attempted to rent out his vehicle through TURO, but again was informed by TURO that because of the recall associated with his VIN number, he was unable to rent the car through TURO. As a result, Mr. Corby's Lincoln has sat idle on the street in front of his home for nearly two months.

24.     As a direct and proximate result of Ford's conduct described herein and failure to disclose the Camera Defect, Mr. Corby has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations associated with the Camera Defect, including, but not limited to diminished value of his vehicle, and other consequential damages.

## 2.     Chad Hobson

25.     Plaintiff Chad Hobson is a resident of Lexington, Kentucky.

26.     In 2022, Mr. Hobson purchased a certified preowned 2020 Lincoln Aviator, VIN 5LM5J7WC3LGL33343 (for purposes of this section "the Vehicle"), from Alton Blakley Ford, an authorized Ford and Lincoln dealership in Somerset, Kentucky. At the time of purchase, Mr. Hobson's vehicle included an extended warranty for the Vehicle up to 100,000 miles.

27.     Mr. Hobson uses the Vehicle for personal, family, and/or household uses.

28.     Prior to purchasing the Vehicle, Mr. Hobson spoke with one or more sales representatives at Alton Blakley Ford regarding the various features, benefits, and attributes of the Vehicle and relied on those when deciding to lease the vehicle. None of the sales representatives informed Mr. Hobson of the latent and dangerous Camera Defect. Moreover, neither Lincoln nor its representatives informed Mr. Hobson of the Camera Defect prior to, or any time after, he purchased his vehicle.

29.     On his way home with the Vehicle after purchase, Mr. Hobson experienced the Camera Defect for the first time.

30.     Mr. Hobson presented the Vehicle to Pinnacle Ford Lincoln in Nicholasville, Kentucky on multiple occasions for software updates and repairs of the Camera Defect, all to no avail. Mr. Hobson raised his complaints about the Camera Defect with the service department, but the Camera Defect persists. His vehicle currently has approximately 30,000 miles.

31.     Despite attempted updates and repairs to the Vehicle, Mr. Hobson still regularly experiences the Camera Defect when he places his vehicle in reverse. Indeed, had Mr. Hobson known of the Camera Defect, he would not have purchased the Vehicle or would have paid substantially less for it.

32.     As a direct and proximate result of Ford's conduct described herein and failure to disclose the Camera Defect, Mr. Hobson has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations associated with the Camera Defect, including, but not limited to diminished value of his vehicle, and other consequential damages.

**3.     Allen Davis**

33.     Plaintiff Allen Davis is a resident of Madisonville, Kentucky.

34.     In 2020, Mr. Davis purchased a new 2020 Ford Explorer, VIN 1FM5K8GC0LGB34237 (for purposes of this section "the Vehicle"), from

Watermark Ford, an authorized Ford dealership in Madisonville, Kentucky. At the time of purchase, Mr. Davis also purchased an extended warranty for the Vehicle up to 100,000 miles.

35.    Mr. Davis uses the Vehicle for personal, family, and/or household uses.

36.    Prior to purchasing the Vehicle, Mr. Davis spoke with one or more sales representatives at Watermark Ford regarding the various features, benefits, and attributes of the Vehicle and relied on those when deciding to lease the vehicle. None of the sales representatives informed Mr. Davis of the latent and dangerous Camera Defect. Moreover, neither Ford nor its representatives informed Mr. Davis of the Camera Defect prior to, or any time after, he purchased his vehicle.

37.    Within the first six months of owning the Vehicle, Mr. Davis experienced the Camera Defect for the first time.

38.    Mr. Davis presented the Vehicle to Watermark Ford on multiple occasions for software updates and repairs of the Camera Defect, all to no avail. Mr. Davis raised his complaints about the Camera Defect with the service department, but the Camera Defect persists. His vehicle currently has approximately 71,000 miles.

39.    Despite attempted updates and repairs to the Vehicle, Mr. Davis still regularly experiences the Camera Defect when he places his vehicle in reverse.

Indeed, had Mr. Davis known of the Camera Defect, he would not have purchased the Vehicle or would have paid substantially less for it.

40.     As a direct and proximate result of Ford's conduct described herein and failure to disclose the Camera Defect, Mr. Davis has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations associated with the Camera Defect, including, but not limited to diminished value of his vehicle, and other consequential damages.

**4.     Neil Dorfman**

41.     Plaintiff Neil Dorfman is a resident of West Bloomfield, Michigan.

42.     In May 2021, Mr. Dorfman leased a new 2021 Lincoln Corsair, VIN 5LMCJ2D96MUL01796 (for purposes of this section "the Vehicle"), from Varsity Lincoln, an authorized Lincoln dealership in Novi, Michigan.

43.     Mr. Dorfman uses the Vehicle for personal, family, and/or household uses.

44.     Prior to leasing the Vehicle, Mr. Dorfman spoke with one or more sales representatives at Varsity Lincoln regarding the various features, benefits, and attributes of the Vehicle and relied on those when deciding to lease the vehicle. None of the sales representatives informed Mr. Dorfman of the latent and dangerous Camera Defect. Moreover, neither Lincoln nor its representatives informed Mr. Dorfman of the Camera Defect prior to, or any time after, he leased his vehicle.

11

45.     Within his first year leasing the Vehicle, Mr. Dorfman experienced the Camera Defect while in reverse.

46.     Mr. Dorfman has presented the Vehicle to Varsity Lincoln on multiple occasions for software updates and repairs of the Camera Defect, all to no avail. Mr. Dorfman raised his complaints about the Camera Defect with the service department, but the Camera Defect persists. His vehicle currently has ap[proximately 7,400 miles.

47.     Despite attempted updates and repairs to the Vehicle, Mr. Dorfman still intermittently experiences the Camera Defect when he places his vehicle in reverse. Indeed, had Mr. Dorfman known of the Camera Defect, he would not have leased the Vehicle or would have paid substantially less for it.

48.     As a direct and proximate result of Ford's conduct described herein and failure to disclose the Camera Defect, Mr. Dorfman has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations associated with the Camera Defect, including, but not limited to diminished value of his vehicle, and other consequential damages.

**B.    Defendant**

49.     Defendant Ford Motor Company is a corporation organized and existing under the laws of the State of Delaware, and headquartered in Dearborn,

Michigan. Ford's principal place of business is located at One American Road, Dearborn, Michigan 48126.

50.     Ford is a motor vehicle manufacturer and a licensed distributor of Ford and Lincoln brand motor vehicles. Ford offers passenger cars, sport utility vehicles, minivans, trucks, and commercial vans, as well as distributes automotive service parts and accessories. Ford is also the warrantor and distributor of Ford vehicles, including the Class Vehicles, within and throughout the United States. Lincoln is Ford's luxury automobile brand comprised of Navigator, Aviator, Corsair and Nautilus model vehicles.

51.     At all times relevant herein, Ford manufactured, sold, and warranted the Class Vehicles throughout the United States. Ford and/or its agents, divisions, or subsidiaries designed, manufactured, and installed camera components on the Class Vehicles.

52.     Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Class Vehicles equipped with the Camera Defect. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Class Vehicles and its 360-Degree Camera, with the intent that such documents be

13

purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

53.    From its headquarters in Michigan, Defendant Ford marketed the Class Vehicles to consumers. Ford and/or its agents designed and manufactured the defective Class Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the defective Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling the Class Vehicles through its network in every state of the United States.

54.    Ford authorizes automobile dealerships disseminate vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, software updates and adjustments covered by Ford's manufacturer warranty pursuant to the contracts between Ford and its numerous authorized dealerships nationwide.

## IV    FACTUAL ALLEGATIONS

### A.    Background

55.    Ford designed, manufactured, distributed, marketed, sold, and/or leased, and continues to sell or lease, the Class Vehicles, nationwide, directly, or

14

indirectly through dealers and other retail outlets. Ford also services Class Vehicles through its nationwide network of authorized dealers and service providers.

56.     Because safety is material to consumers, including Plaintiff and the Class, Ford advertises that drivers can "journey with confidence" in its vehicles, [5] including Class Vehicles, based on the vehicles' "extensive collection of available driver-assist technologies utiliz[ing] a network of sensors and sophisticated cameras to offer you support during many scenarios." [6] Ford also advertises "Add a 360-Degree Camera with Split-View Display helps you navigate tight spots with ease. In Explorer, there's no limit to convenience."[7]



JOURNEY WITH CONFIDENCE
Our extensive collection of available driver-assist technologies[1] utilizes a network of sensors and sophisticated cameras to offer you support during many scenarios. These advanced features are all aimed at helping you feel confident and in control.



A simple press of a button quickly folds down the 3rd-row seat to give you more room. And a 360-Degree Camera with Split-View Display helps you navigate tight spots with ease. In Explorer, there's no limit to convenience.

57.     Ford widely markets its 360-Degree Camera and backup cameras' safety features. For example, Ford touts that the Ford Co-Pilot 360 system present

---

[5] *See, e.g.,* **Exhibit 1**, MY 2021 Lincoln Corsair brochure at 5.
[6] *See, e.g.,* **Exhibit 2**, MY 2021 Lincoln Aviator brochure at 8.
[7] *See, e.g.*, **Exhibit 3**, MY 2021 Ford Explorer Brochure at 15.

on its Explorer models is "Ready with an Assist" by "helping you navigate Reverse clearly and with more confidence."[8] Ford also touts that with Ford Co-Pilot360, drivers "[g]et a clear picture of your surroundings." [9] Ford advertises that its' Co-Pilot360 provides Pre-Collision Assist with Automatic Emergency Braking (AEB); 360-Degree Camera with Split-View Display; Reverse Sensing System, Auto High-Beam Headlamps; BLIS® (Blind Spot Information System) with Cross-Traffic Alert; and Lane-Keeping System.[10] And, its 360-Degree Camera "lets you see around the Explorer, from every side. Very helpful while centering in a parking spot or while navigating a tight section of trail."[11]


**REAR VIEW CAMERA**
Backing up requires a little multitasking. Our Rear View Camera helps by providing a great view of what's behind your vehicle. It also helps when you're lining up a trailer. A washer helps keep the camera free of debris (like dirt or snow), helping you navigate Reverse clearly and with more confidence.

*Standard on every 2020 Ford Explorer*


**360-DEGREE CAMERA**
True to its name, the 360-Degree Camera with Split-View Display lets you see around Explorer, from every side. Very helpful while centering in a parking spot or while navigating a tight section of trail.

*Standard on Limited*

---

[8] *See, e.g.*, **Exhibit 4**, MY 2020 Ford Explorer Brochure at 9-10.
[9] *See, e.g.*, **Exhibit 3**, MY 2021 Ford Explorer Brochure at 8.
[10] *See, e.g.*, **Exhibit 3**, MY 2021 Ford Explorer Brochure at 14-16.
[11] *See, e.g.*, **Exhibit 4**, MY 2020 Ford Explorer Brochure at 9-10.

58.     Purchasers or lessees of the Class Vehicles are provided a "New Vehicle Limited Warranty" ("NVLW") by Ford at the time of purchase or lease. For example, the NVLW for the 2021 Lincoln Aviator, which includes bumper to bumper warranty coverage, and lays out the vehicle's coverage as shown below:

> **NEW VEHICLE LIMITED WARRANTY** Your new Lincoln has the following coverage: 4-year/50,000-mile bumper-to-bumper coverage, 6-year/70,000-mile powertrain coverage, 5-year/60,000-mile safety restraint coverage, and 5-year/unlimited-mile corrosion perforation (aluminum panels do not require perforation) coverage. Unique electric components come with 8-year/100,000-mile hybrid/electric unique coverage. Whichever comes first. Please ask your dealer for a copy of these limited warranties.

59.     Lincoln's website also promotes that "The Limited Warranty covers all parts on the vehicle that require repair, replacement or adjustment as a result of a manufacturing defect in factory-supplied materials or factory workmanship," which includes remedying the Camera Defect.[12]

60.     Ford, via its authorized dealers, exercises sole authority in deciding if and to what extent a particular repair is covered under the NVLW.

**B.      The Camera Defect**

61.     Class Vehicles are equipped with a 360-Degree Camera system, thus placing them at risk of the Camera Defect that causes loss of image on the rearview

---

[12]Lincoln Warranty Information, Warranty Quick Guide, "New Vehicle Limited Warranty" https://www.lincoln.com/support/warranty/ [last accessed August 30, 2023], attached hereto as **Exhibit 15**.

camera display due to a frozen blue or black screen, glitches, and/or camera failures. The Camera Defect causes the backup camera rearview image to not properly display when Class Vehicles are placed in reverse. As such, the Class Vehicles fail to comply with the requirements of Federal Motor Vehicle Safety Standard 111, "Rear Visibility."

62.     Ford initially described the Camera Defect to its dealerships as "an issue within the 360° cameras may cause the video information from one or more of the 360° cameras, including the rear-view camera, to fail to feed to the SYNC display screen during some key cycles when the vehicle is shifted into reverse. If this occurs, the SYNC screen will display a blue screen. The issue is intermittent and may recover during subsequent ignition cycles. The loss of the rear camera image during a reverse action increases the risk of crash."[13]

63.     Further, once the Camera Defect materializes, "the issue will likely reoccur on the same camera(s) intermittently," until the Defect is fixed.[14]

64.     Both Ford and NHTSA classify the Camera Defect as a Safety Defect that necessitates safety recalls.[15]

---

[13] *See., e.g.*, https://static.nhtsa.gov/odi/rcl/2021/RCMN-21V735-2097.pdf [last accessed September 10, 2023], attached hereto as **Exhibit 7**.

[14] NHTSA Part 573 Safety Recall Report 21V-735, September 23, 2021, https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V735-6073.PDF [last accessed September 10, 2023], attached hereto as **Exhibit 6**.

[15] *Id.*; see also https://static.nhtsa.gov/odi/rcl/2021/RCMN-21V735-9800.pdf last accessed September 10, 2023] attached hereto as **Exhibit 9**;

65.     Ford has known or should have known of the Camera Defect since at least February 9, 2021, the date of the first NHTSA complaint documenting the Camera Defect, and likely well before that date, given that on March 9, 2021, Ford's Critical Concerns Review Group opened an investigation into multiple reports Ford had received of "intermittent loss of image on the rearview camera display."[16]

**C.     Ford Pursues Three Ineffective Recalls for the Camera Defect**

66.     On September 22, 2021, NHTSA acknowledged Ford's notification to NHTSA of Safety Recall 21S44 regarding the Camera Defect. Safety Recall 21S44 notified drivers of the Camera Defect and that video output may fail, preventing the rearview camera image from displaying in certain 2020-2021 Lincoln Aviator, Corsair and Ford Explorer vehicles equipped with 360-degree cameras that were assembled in the Chicago, Chicago SHO and Louisville Assembly Plants.[17] Overall, this safety recall affected 228,297 Class Vehicles. Thereafter, on September 23, 2021, Ford notified its dealers of Safety Recall 21S44.[18] This safety recall directed

---

https://static.nhtsa.gov/odi/rcl/2021/RCMN-21V735-2097.pdf [last accessed September 10, 2023] attached hereto as **Exhibit 7**;
https://static.nhtsa.gov/odi/rcl/2021/RCAK-21V735-3681.pdf [last accessed September 10, 2023], attached hereto as **Exhibit 8.**

[16] NHTSA Part 573 Safety Recall Report 21V-735, September 23, 2021, https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V735-6073.PDF [last accessed September 10, 2023], attached hereto as **Exhibit 6**.

[17] https://static.nhtsa.gov/odi/rcl/2021/RCMN-21V735-9800.pdf [last accessed September 10, 2023], attached hereto as **Exhibit 9.**

[18] https://static.nhtsa.gov/odi/rcl/2021/RCAK-21V735-3681.pdf [last accessed September 10, 2023], attached hereto as **Exhibit 8.**

dealerships and service departments to install a software update to the Image Processing Module (IPMB) software.[19]

67.    On its website, Ford highlighted Safety Recall 21S44 and acknowledges the safety risk posed by the Camera Defect, specifically stating that "[t]he loss of rearview camera image during a backing event can reduce the drivers view of what is behind the vehicle, increasing the risk of a crash."[20]

68.    Following the software update recommended by 21S44, Ford's Critical Concern Review Group (CCRG) identified an increase to 1,867 warranty reports by August 2021 and reported a higher rate of the Camera Defect in Class Vehicles after 18 months in service.[21] By September 2021, Ford was already made aware of at least two accidents caused by the Camera Defect.[22]

69.    On October 22, 2021, NHTSA reported additional Vehicle Owner Questionnaires (VOQs) related to ongoing reports of the Camera Defect to Ford,

---

[19] *Id.*

[20] *See, e.g.*, Recalls, "2020-2021 aviator, explorer, CORSAIR-REAR/360 camera ipmb blue screen" https://www.ford.com/support/recalls-details/explorer/2020/ [last accessed August 30, 2023], attached hereto as **Exhibit 10.**

[21] *Id.*

[22] NHTSA Part 573 Safety Recall Report 21V-735, September 23, 2021, https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V735-6073.PDF [last accessed September 10, 2023], attached hereto as **Exhibit 6**.

describing a blue image in the rear camera display after completion of the Safety Recall 21S44 software update.[23]

70.    On November 10, 2021, Ford notified dealerships of a flaw in the IPMB software used during the 21S44 recall service, and reported that certain vehicles, including previously recalled 2020-2021 Explorer Aviator and Corsair vehicles, would "need to be reprogramed again," under Safety Recall 21S44 because the original software update was still causing blue screens and inoperative 360 Degree Cameras.[24]

71.    Even after the completion of 21S44, and the additional reprogramming update, in January 2022, NHTSA notified Ford of five additional VOQs reporting the Camera Defect after completion of Safety Recall 21S44, indicating the 21S44 software service was ineffective at repairing the Camera Defect.[25]

72.    On March 15, 2022, Ford's CCRG opened yet another investigation into the Camera Defect, having received multiple additional VOQs reporting the presence of Camera Defect after completion of 21S44 safety recall repair.

---

[23] https://static.nhtsa.gov/odi/rcl/2023/RMISC-23V022-0503.pdf [last accessed September 10, 2023], attached hereto as **Exhibit 11.**
[24] https://static.nhtsa.gov/odi/rcl/2021/RCMN-21V735-2097.pdf [last accessed September 10, 2023], attached hereto as **Exhibit 7.**
[25] https://static.nhtsa.gov/odi/rcl/2023/RMISC-23V022-0503.pdf [last accessed September 10, 2023], attached hereto as **Exhibit 11.**

73.    On December 7, 2022, CCRG reported an increase in warranty claims for the Camera Defect in Class Vehicles, including 2022 models produced after the 21S44 recall and IPMB software update, proving Ford still had not developed an no effective repair for the Camera Defect and continually leaving Class Vehicles susceptible to an increased risk of a crash.[26]

74.    By January 2023, Ford was now aware of seventeen reported minor accidents as a result of the Camera Defect and ineffectiveness of Safety Recall 21S44.[27]

75.    Ford issued a second safety recall (23S02), on January 23, 2023, which expanded the previous 21S44 recall to include all recent model years of Lincoln Aviator, Corsair, and Ford Explorer vehicles equipped with a 360-degree camera. Safety Recall 23S02 recalled 382,759 Class Vehicles, including 279,700 2020-2023 Ford Explorer, 30,360 2020-2022 Lincoln Corsair, and 72,699 2020-2023 Lincoln Aviator Class Vehicles.[28]

76.    Just four months later, in May 2023, Ford issued a third safety recall (23S23) expanding previous recalls and now recalling 422,201 Class Vehicles equipped with 360-degree camera. Safety Recall 23S23 recalled 311,453 2020-2023

---

[26] https://static.nhtsa.gov/odi/rcl/2023/RMISC-23V022-0503.pdf [last accessed September 10, 2023], attached hereto as **Exhibit 11.**
[27] *Id.*
[28] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V022-4349.PDF [last accessed September 10, 2023], attached hereto as **Exhibit 12.**

Ford Explorer, 30,434 2020-2022 Lincoln Corsair, and 80,314 2020-2023 Lincoln Aviator Class Vehicles. This most recent recall also supersedes the previous two recalls for the Camera Defect, but still fails to repair the pervasive Camera Defect.[29]

77.    With 23S23, Ford now admits that there is now known repair for the Camera Defect, as "the remedy is under development. Root cause is unknown."[30] Ford continues to fail to adequately recall and repair the Camera Defect in Class Vehicles despite the known safety risk and continued increase in the number of minor crashes reported.

78.    In July 2023, Plaintiffs, and members of the class received a Letter Notice of safety recall 23S23. Ford states in that letter that Ford currently "does not have a permanent fix available [for the Camera Defect]; however, if you observe a blue or black screen on the rearview/360 degree camera when in reverse, Ford has authorized your retailer to update the camera system's software as an interim repair prior to availability of the permanent fix."

79.    To date, Ford has not fixed the Camera Defect in Class Vehicles and offers no data indicating that the most recent "interim repair," suggested in Ford's July 2023 letter to Class Members, will actually repair the Defect. The Camera Defect has persisted in Class Vehicles since at least 2020, and Plaintiff and the Class

---

[29] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V342-5988.PDF[last accessed September 10, 2023], attached hereto as **Exhibit 13.**
[30]  *Id*.

continue to face safety risks through loss of rear camera image while in reverse increases the risk of a crash.

### 1.    Permanent Damage Caused by the Failed Recalls

80.    Ford tracked and reported repairs of the vehicles involved in the three recalls to NHTSA.

81.    Ford plainly knew that the "fix" it implemented with these recalls would not resolve the Camera Defect.

## D.    Ford Has Long Been Aware of the Camera Defect and Is Aware that It Persists

82.    Federal law requires Ford to be in close contact with NHTSA at all times regarding potential automobile defects. Federal law also imposes a legal requirement compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data.[31]

83.    All vehicle manufacturers, including Ford, routinely monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify safety related defects in their vehicles. Ford, given its superior knowledge and expertise, knew or should have known of the *many* complaints revealing the Camera Defect logged by NHTSA's Office of Defects

---

[31] See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

Investigation (ODI). Some examples below of such complaints logged on the NHTSA website reveal that Ford's network of dealers, service advisors, and repair technicians have been aware of the Camera Defect and that, despite having knowledge of the Defect and of the Class Vehicles affected, they have failed to repair the defect, even while Class Vehicles are still under warranty.

84.    Ford has knowledge of NHTSA complaints filed concerning the vehicles it manufactures with the Camera Defect, including the following examples excerpted below:

**Date of Incident**: July 19, 2021
**Date Complaint Filed**: July 30, 2021
**Vehicle**: 2020 Lincoln Aviator SUV
**NHTSA ID**: 11427154
**Summary of Complaint**: Rear backup camera tuns to blue screen when the vehicle is put into reverse. Also rear brake assist works sometimes. Vehicle was turned into service for previous rear camera recall, but condition has returned.

**Date of Incident**: January 8, 2022
**Date Complaint Filed**: January 10, 2022
**Vehicle**: 2020 Lincoln Aviator SUV
**NHTSA ID**: 11446837
**Summary of Complaint**: This vehicle has been recalled at least twice for a faulty rear camera system. When vehicle is put in reverse the image on the screen flips so bad you cannot see what is behind you. The previous recalls were for this, we had it in the shop twice before the 2 recalls plus the two recalls (4 times) and cannot get a properly working rear camera. This is a safety issue because we rely on the camera for blind spots during reverse and to see behind this large vehicle. Ford cannot figure out how to fix.

**Date of Incident**: March 5, 2020
**Date Complaint Filed**: August 8, 2020

**Vehicle**: 2020 Lincoln Corsair SUV
**NHTSA ID**: 11344018
**Summary of Complaint**: My camera stopped working multiple times. Error Contact Dealership. Camera scattered screen. System deletes saved settings. Mirror. I adjusted it for myself. Then the mirror automatically closed the driver mirror cracked.

**Date of Incident**: January 10, 2022
**Date Complaint Filed**: March 30, 2022
**Vehicle**: 2020 Lincoln Corsair SUV
**NHTSA ID**: 11458932
**Summary of Complaint**: The camera often turns blue/black when backing up.

**Date of Incident**: May 1, 2023
**Date Complaint Filed**: July 8, 2023
**Vehicle**: 2020 Ford Explorer SUV
**NHTSA ID**: 11531064
**Summary of Complaint**: I have had the previous recall for my rear camera/display screen repaired in 08/2022. However, recently I have had my display screen start to glitch and turn off intermittently. Sometimes this happens while I am driving. Other times it happens while I am in reverse and the reverse camera does not work. When the reverse camera is not functioning there is concern for unseen dangers. I have videos of this but I cannot upload them into the form.

**Date of Incident**: November 22, 2020
**Date Complaint Filed**: November 22, 2020
**Vehicle**: 2020 Ford Explorer SUV
**NHTSA ID**: 11375806
**Summary of Complaint**: When reversing camera will show blue screen and not give any additional warnings since nothing can be detected. This is an on and off issue so it can happen at any time. I've added pictures take at different days and times. I've just put today's date because I can't remember how long as this has been happening for.

**Date of Incident**: February 5, 2021
**Date Complaint Filed**: February 9, 2021
**Vehicle**: 2020 Ford Explorer SUV
**NHTSA ID**: 11395333

**Summary of Complaint**: All cameras intermittingly not functioning. Dealer replaced camera module. Rear camera still not functioning. Said current recall for rear camera does not apply because my vehicle manufacturer date is out of range for recall. Dealer blaming rear camera not working on Ford accessory dash camera.

**Date of Incident**: January 14, 2022
**Date Complaint Filed**: January 16, 2022
**Vehicle**: 2021 Lincoln Aviator SUV
**NHTSA ID**: 11447655
**Summary of Complaint**: The Rear View Camera (entire screen) constantly turns on and off when reversing the vehicle. It has been inspected several times with no resolve.

**Date of Incident**: May 4, 2022
**Date Complaint Filed**: May 28, 2023
**Vehicle**: 2021 Lincoln Aviator SUV
**NHTSA ID**: 11524254
**Summary of Complaint**: It has been almost a half year and still no solution for backup camera that shows blue screen. It is happening more and more. It is a big vehicle (and expensive one). When backing up, one is at a great disadvantage with just a blue screen. You cannot see people or other objects. Car dealership says they do not know when it will be rectified. I think Ford/Lincoln is dragging their feet, using COVID as an excuse.

**Date of Incident**: March 7, 2022
**Date Complaint Filed**: March 7, 2022
**Vehicle**: 2021 Lincoln Corsair SUV
**NHTSA ID**: 11455466
**Summary of Complaint**: My backup camera still turns blue. I have had the recall done to fix the issue but it still happens occasionally. Seems to be just random when it happens and no direct cause when it does happen.

**Date of Incident**: March 8, 2023
**Date Complaint Filed**: April 5, 2023
**Vehicle**: 2021 Lincoln Corsair SUV
**NHTSA ID**: 11515652

**Summary of Complaint**: The backup camera gets a blue screen. It was repaired via a recall, however it still occurs while backing up.

**Date of Incident**: October 14, 2021
**Date Complaint Filed**: October 21, 2021
**Vehicle**: 2021 Ford Explorer SUV
**NHTSA ID**: 11437614
**Summary of Complaint**: I had the safety recall 21V735000 performed on October 12, 2021. Within 2 days the same problem of rear-view backup camera blue screen recurred, just as it did before the recall. The problem happens in about 1/3 of trips. Once the blue screen occurs, it doesn't go away until powering off the vehicle, waiting a few minutes, and then upon powering the vehicle on the rear backup camera might work again for a while, but will usually break again the same day.

**Date of Incident**: April 25, 2022
**Date Complaint Filed**: May 1, 2022
**Vehicle**: 2021 Ford Explorer SUV
**NHTSA ID**: 11462906
**Summary of Complaint**: I had the backup camera parts replaced 4/15/2022 and within 10 days of having the vehicle back the backup camera was turning blue again.

**Date of Incident**: March 6, 2023
**Date Complaint Filed**: March 6, 2023
**Vehicle**: 2021 Ford Explorer SUV
**NHTSA ID**: 11510460
**Summary of Complaint**: The rear camera has not worked since the vehicle was purchased in spring of 2021. It has now been "repaired" 3 times based on open recalls. however the issue is a known issue and can not be fixed. We have now been told they will need to replace the camera which is on indefinite backorder. This is a huge vehicle safety issue Ford is aware of and yet not one of their alleged recalls actually resolves this serious issue. had the backup camera parts replaced 4/15/2022 and within 10 days of having the vehicle back the backup camera was turning blue again.

**Date of Incident**: May 27, 2022
**Date Complaint Filed**: June 1, 2022
**Vehicle**: 2022 Lincoln Aviator SUV

**NHTSA ID**: 11467007

**Summary of Complaint**: The vehicle back up camera and computer screen went totally dark and would not come back on, so that when I backed out of the garage, I could not see on the rear side of the vehicle, as to any pedestrians walking across my driveway , beside nor behind my vehicle. I drove the vehicle back into the garage and ran my errand in our other car. When I came back from the errand, I tried to get the screen up again, by starting the car, and the HOME page came on the screen, and when I put the vehicle in reverse, it once again, showed the rear view of the driveway and cross way, to see that there was no pedestrian behind me; putting any neighbor child who ran across my drive while the garage walls blocked them from my view, in danger. After that one instance, it hasn't done it since. Today, while in shop for routine maintenance, I mentioned it to the Service Advisor. He said "There's a recall out on that, " I said, "will you fix it today while I'm here?" He said, "yes'. At home, upon reviewing paperwork, about what was done, no mention of fixing the recall, nor seeing why the camera screen went dark, was made. So, I called the Dealer and was told "There is no outstanding recall on your vehicle" They have told me I may make an appointment to leave my car at least a day for them to diagnose the problem. There was no warning, before the backup screen on my dash went totally dark. This was one time and, on May 27, 2022. Our vehicle barely has 1000 miles on it. We bought it new in January 2022. Since the Dealership did not write down my complaint, I decided to give you a written statement.

**Date of Incident**: September 2, 2022
**Date Complaint Filed**: September 2, 2022
**Vehicle**: 2022 Lincoln Aviator SUV
**NHTSA ID**: 11482686
**Summary of Complaint**: I had several instances and two minor collisions now where the back up camera glitches as well as the warning alert. I've come close to hitting object only to stop just in time, however in these two collisions I was I situations where I needed to maneuver faster and needed accurate guidance. I don't recall the screen ever showing up until after the collisions and the louder long warning tone went off right at or just after impact. Both times have cause damage to my car. I've never had issues with minor self-involved car accidents. My driving record is clean. Reading about the back up camera recalls for the 20 and 21 models sound like what is happening with my car but

also with the alert system. There are glitches keeping this safety feature from meeting much needed driving assurance.

**Date of Incident**: May 22, 2023
**Date Complaint Filed**: June 8, 2023
**Vehicle**: 2022 Lincoln Aviator SUV
**NHTSA ID**: 11526116
**Summary of Complaint**: The display on our 2022 Lincoln Aviator failed, again. It had been repaired by the dealer with a new rear camera. It failed to show the backup view, again, and also that display shows the controls for defrost and other safety features. It was a rainy day, so, we were without a display screen showing the backup camera AND could not turn on our defroster as it is located on that dark screen, also. Our windows fogged due to no defroster, and, we had no back up camera view to show traffic behind us. We called the dealer and, they said wait for a recall, as one on the software is in the making right now. There was no warning that this would happen. after driving the vehicle and parking and restarting it, the display lit up again.

**Date of Incident**: May 13, 2022
**Date Complaint Filed**: May 15, 2022
**Vehicle**: 2022 Lincoln Corsair SUV
**NHTSA ID**: 11464682
**Summary of Complaint**: The screen in which my backup camera appears on seems to not be connected to my vehicle. This screen is also the primary method for controlling AC, radio, parking/camera, and general settings. Initially it was black and did not turn on. After doing some type of "reset" that was suggested during the Lincoln chat, it came on; however, it looks like it was updated with a Ford update, is blue, and looks completely different. It also does not sync to my vehicle and backup camera still does not work. I also have to manually turn radio off because the screen will literally stay on and run the battery. I am simply scared to drive my new vehicle! Service can not get me in until next week which makes me nervous!

**Date of Incident**: January 29, 2023
**Date Complaint Filed**: June 29, 2023
**Vehicle**: 2022 Lincoln Corsair SUV
**NHTSA ID**: 11529596

**Summary of Complaint**: The contact owns a 2022 Lincoln Corsair. The contact stated while reversing, the rearview camera image turned blue. There was no warning light illuminated. The contact stated that the failure occurred increasingly. The contact received recall notification of NHTSA Campaign Number: 23V342000 (Back Over Prevention), however, the part to do the recall repair was not yet available. The vehicle was taken to the dealer, where it was diagnosed that the rearview camera had failed. The vehicle was not repaired. The contact stated that the failure had been occurring routinely. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair. The manufacturer was not made aware of the issue. The failure mileage was approximately 100. VIN tool confirms parts not available.

**Date of Incident**: May 1, 2023
**Date Complaint Filed**: June 29, 2023
**Vehicle**: 2022 Ford Explorer SUV
**NHTSA ID**: 11529586
**Summary of Complaint**: The contact owns a 2022 Ford Explorer. The contact stated that while reversing, the vehicle was shaking and slow to respond. The contact stated that the back over prevention camera screen was gray while the vehicle was rolling backwards. The contact stated that the back over prevention camera screen then turned blue. There were no warning lights illuminated. The contact called the local dealer, but the vehicle was not diagnosed or repaired due to a scheduling issue. The manufacturer was contacted and referred the contact back to the dealer. The failure mileage was approximately 18,000.

**Date of Incident**: December 12, 2022
**Date Complaint Filed**: May 21, 2023
**Vehicle**: 2022 Ford Explorer SUV
**NHTSA ID**: 11523071
**Summary of Complaint**: Vehicle is as purchases brand new in august 2022. After a few months when engaging reverse, there is a lag time of 3-10 seconds. The reverse screen in dash does not engage as well. Local dealer "fixed" in February 2023 at roughly 5k miles. Issue has returned. When brought to dealer beginning of May 2023. We were informed they would not work on it as it's a known issue with no fix. Issue is creating problems when attempting parallel parks, k-turns, parking, anything to do in the road requiring timeliness and safe execution of

31

parking. When vehicle has the lag time it is not in gear and will roll if on an incline.

**Date of Incident**: February 20, 2023
**Date Complaint Filed**: February 20, 2023
**Vehicle**: 2023 Lincoln Aviator SUV
**NHTSA ID**: 11508209
**Summary of Complaint**: Manufacturer Recall Number23S02 NHTSA Recall Number23V022 Repair made on 02/20/2023. Camera continues to randomly pixelate and/or give black/blue screen. Failure can happen at any time and without warning. What component or system failed or malfunctioned, and is it available for inspection upon request? Camera system. How was your safety or the safety of others put at risk? Yes Has the problem been reproduced or confirmed by a dealer or independent service center? Yes Video has been taken and supplied as well. Has the vehicle or component been inspected by the manufacturer, police, insurance representatives or others? Lincoln Dealership. Software update to comply with Recall was performed. Were there any warning lamps, messages or other symptoms of the problem prior to the failure, and when did they first appear? No will work and without warning fail.

85.     On information and belief, Ford knew or should have known about the Camera defect before the Class Vehicles went to market. At the very least, Ford certainly knew of the Camera Defect well before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Class Vehicles; (2) the direct and public reports of the failure of the rearview/360 degree camera in the Class Vehicles, as set forth above; (3) Ford's own investigation of the rearview/360 degree camera failures in the Class Vehicles; and (4) the implementation of the three recalls.

86.     Despite notice and knowledge of the Camera Defect from the thousands of complaints Ford has received, plus the information received from dealers,

NHTSA complaints, and its own internal records, including pre-sale testing, Ford has not adequately recalled and/or offered an effective Camera system repair to the Class Vehicles or offered to reimburse customers who have incurred out-of-pocket expenses as a result of the Camera Defect.[32]

87.    Now with three recalls targeting persistent problems with the 360-Degree Camera screens, and previous attempts at repairing those problems deemed unsuccessful, thousands of Ford and Lincoln drivers have reported ongoing problems with the Camera Defect causing their Class Vehicle screens to consistently display a blue or black color or glitches when placed in reverse.

88.    Ford admits that its previous attempted software fixes were ineffective at correcting this safety concern. In fact, more than two years on, Ford states that "[t]he root cause [of the Camera Defect] is unknown and under investigation."[33]

89.    Owners and lessees of the Class Vehicles have communicated with Ford and/or its dealers to request that they remedy and/or address the Camera Defect at no expense. However, Ford routinely fails to successfully remedy the problem,

---

[32] https://static.nhtsa.gov/odi/rcl/2023/RMISC-23V022-0503.pdf [last accessed September 10, 2023], attached hereto as **Exhibit 11.**

[33] *See, e.g.*, https://www.ford.com/support/how-tos/recall/recalls-and-faqs/2020-2023-ford-explorer-camera-blue-screen-recall/#:~:text=Recall%20Reference%20Number%3A%2023S23,root%20cause%20of%20blue%20screen. [last accessed September10, 2023]., attached hereto as **Exhibit 14.**

even with Class Vehicles within the warranty period, because Ford "currently do[es] not have a remedy" to fix the Camera Defect.[34]

## V    CLASS ALLEGATIONS

90.    Plaintiffs brings this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses:

> **Nationwide Class**: All persons or entities in the United States or any of its territories who purchased or leased one or more model year 2020-2023 Ford Explorer, 2020-2023 Lincoln Aviator or 2020-2023 Lincoln Corsair vehicles equipped with a 360-degree Camera (the "Class Vehicles").

> **Michigan State Subclass:** All persons or entities in the State of Michigan who purchased or leased one or more model year 2020-2023 Ford Explorer, 2020-2023 Lincoln Aviator or 2020-2023 Lincoln Corsair vehicles equipped with a 360-degree Camera (the "Class Vehicles").

> **California State Subclass:** All persons or entities in the State of California who purchased or leased one or more model year 2020-2023 Ford Explorer, 2020-2023 Lincoln Aviator or 2020-2023 Lincoln Corsair vehicles equipped with a 360-degree Camera (the "Class Vehicles").

> **Kentucky State Subclass:** All persons or entities in the State of Kentucky who purchased or leased one or more model year 2020-2023 Ford Explorer, 2020-2023 Lincoln Aviator or 2020-2023 Lincoln Corsair vehicles equipped with a 360-degree Camera (the "Class Vehicles").

---

[34] *Id.*

91.     Excluded from each Class and Subclass are any persons presenting claims for personal injury or property damage caused by the Camera Defect. Also excluded from the Class and Subclasses are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

92.     This action has been brought and may be properly maintained on behalf of the Class and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

93.     **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be at least 422,200 or more Class Vehicles in the Nationwide Class. The precise number of Class and Subclass Members is unknown to Plaintiffs but may be ascertained from Ford's books and

records. Class and Subclass Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and published notice.

94.   **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass Members, including, without limitation:

- whether Ford engaged in the conduct alleged herein;

95.   whether the Camera Defect creates an unreasonable safety risk in the Class Vehicles;

96.   when Ford first knew about the Camera Defect;

97.   whether Ford recalled Class Vehicles for the safety risk posed by the Camera Defect in an adequate and timely manner;

98.   whether Ford designed, manufactured, marketed, and distributed the Class Vehicles with defective component(s) that caused the Camera Defect;

- whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

99.   whether Ford has been unjustly enriched at the expense of Plaintiff and the Class and Subclasses;

100.    whether Plaintiff and the Class and Subclass Members overpaid for their vehicles at the point of sale; and

- whether Plaintiff and the Class and Subclass Members are entitled to damages and other monetary relief and, if so, in what amount.

101.    **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass Members' claims because, among other things, all Class and Subclass Members were comparably injured through Ford's wrongful conduct as described above.

102.    **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

103.    **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class and Subclass Members are relatively small compared

to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for Ford's wrongful conduct. Even if Class and Subclass Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI    CLAIMS FOR RELIEF

**A.    Claims on Behalf of the National Class or, in the alternative, the State Subclasses**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

### (15 U.S.C. § 2301, *et seq.*)

**(Alleged by Plaintiffs on behalf of the Nationwide Class or, in the Alternative, the State Subclasses)**

104. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

105. Plaintiffs bring this claim on behalf of the Nationwide Class and on behalf of the State Subclasses.

106. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

107. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

108. Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

109. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty. Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Class Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled. Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiffs under 15 U.S.C. § 2310(d)(1).

Without limitation, the Class Vehicles share a common defect in that they are all equipped with a defect in 360-degree camera. With this Camera Defect, no image is displayed on the vehicle's screen, thus reducing the Class Vehicles' rear view leaving the Class Vehicles susceptible to an increased risk of a crash, bodily harm, and property damage to owners and lessees of the Class Vehicles, as well as an unreasonable risk of damage and harm to other nearby property, passengers, and bystanders. The Camera Defect rendered the Class Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and operating in reverse) when they were sold or leased, and at all times thereafter.

110.   As discussed herein, on information and belief, Ford knew or should have known about the Camera Defect from its own testing of the Class Vehicles before launching each new model year of the Class Vehicles equipped with the 360-degree camera. Ford omitted information about the Camera Defect and its safety consequences from Plaintiff and Class members, misrepresented the qualities of the Class Vehicles and their 360-degree cameras, and has failed to provide a fix for the Camera Defect.

111.   Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

112. Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiff, because, at the time of purchase and lease, Plaintiff had no other options for purchasing warranty coverage other than directly from Ford.

113. Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Class Vehicles were equipped with a defective camera and that the Class Vehicles' 360-degree camera would malfunction when used as intended long before Plaintiffs and the Class. Ford failed to disclose this defect to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

114. Plaintiffs have had sufficient direct dealings with either Ford or its agents to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as the defective 360-

degree cameras present an unreasonable safety risk of increased risk of crashing as well as an unreasonable risk of damage or harm to other nearby property, passengers, and bystanders.

115.   Under 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs under Rule 23 of the Federal Rules of Civil Procedure.

116.   Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

117.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual

time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class members in connection with the commencement and prosecution of this action.

118. Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Camera Defect in their Class Vehicles.

**COUNT II**

**FRAUDULENT OMISSION**

**(Common Law)**

**(Alleged by Plaintiffs on behalf of the Nationwide Class or, in the Alternative, the State Subclasses)**

119. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

120. Ford was aware of the Camera Defect within the Class Vehicles, as well as the true nature of the Class Vehicles as a whole, when it marketed and sold the Class Vehicles to Plaintiffs and the Nationwide and State Subclass Members.

121. Having been aware of the Camera Defect within the Class Vehicles, as well as the true nature of the Class Vehicles as a whole, and having known that Plaintiffs and the other members of the Nationwide Class and State Subclasses could

not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiffs and the other members of the Classes in connection with the sale or lease of the Class Vehicles.

122.   Ford did not disclose the Camera Defect or the true nature of the Class Vehicles to Plaintiffs and members of the Classes in connection with the sale or lease of the Class Vehicles.

123.   For the reasons set forth above, the Camera Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

124.   In purchasing and leasing the Class Vehicles, Plaintiffs and the other members of the Classes reasonably relied on Ford to disclose known material defects with respect to the Class Vehicles.

125.   Because Ford fraudulently concealed the Camera Defect, as well as the true nature of the Class Vehicles, Plaintiffs were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from this dangerous Defect. Had Plaintiffs and the other members of the Classes known of the true nature of the Class Vehicles, including the Camera Defect, they would not have purchased or leased the Class Vehicles or would have paid less for the Class Vehicles.

126.   Through its omissions regarding the true nature of the Class Vehicles, as well as the Camera Defect, Ford intended to induce, and did induce, Plaintiffs and the other members of the Classes to either purchase or lease a Class Vehicle that they otherwise would not have purchased or pay more for a Class Vehicle than they otherwise would have paid.

127.   As a direct and proximate result of Ford's omissions, Plaintiffs and the other members of the Nationwide Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the true nature of the Class Vehicles, including the Camera Defect, had been disclosed to them and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT III

## BREACH OF CONTRACT

## (COMMON LAW)

## (Alleged by Plaintiffs on behalf of the Nationwide Class or, in the Alternative, the State Subclasses)

128.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

129.   Plaintiffs bring this Count on behalf of the Nationwide Class and, in the alternative, on behalf of the State Subclasses.

130.   Every purchase or lease of a Class Vehicle from an authorized dealer of Ford constitutes a contract between Ford and the purchaser or lessee. Ford materially breached these contracts by selling or leasing Plaintiffs and Class members defective, non-compliant Class Vehicles and by misrepresenting or failing to disclose the existence of the Camera Defect, rendering the Class Vehicles substantially less valuable than the vehicles that Ford advertised and promised to deliver to Plaintiffs and Class members.

131.   Ford's misrepresentations and omissions alleged herein, including Ford's misrepresentation of the Camera defect and failure to disclose the existence of the Camera Defect, caused Plaintiffs and the other Class members to enter into their agreements to purchase or lease their Class Vehicles. In purchasing or leasing their Class Vehicles, Plaintiffs did not get the benefit of their bargain since the vehicles were worth less than they would have been without the Camera Defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy the Camera Defect. Those Class members who sold their dangerous Class Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair.  Absent those misrepresentations and omissions, Plaintiffs and Class members would not have purchased or leased their Class Vehicles, would not have purchased or leased their Class Vehicles at the prices

they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Camera Defect. Accordingly, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

132.   Ford also breached the implied covenant of good faith and fair dealing under the laws of all 50 States and the District of Columbia. By delivering a vehicle that contained the Camera Defect, the Ford violated Plaintiffs' and Class members' fair and reasonable expectations under their respective contracts. In addition, Ford's misrepresentations and omissions violated Ford's implied duty to deal honestly, and within reasonable commercial standards of fair dealing, with Plaintiffs and Class members.

133.   As a direct and proximate result of Ford's breach, Plaintiffs and Class members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IV

## UNJUST ENRICHMENT

## (COMMON LAW)

## (Alleged by Plaintiffs on behalf of the Nationwide Class or, in the Alternative, the State Subclasses)

134.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

135.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the state-specific Subclasses. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all the states.

136.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

137.   Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

138.   Ford has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiffs and Nationwide Subclass Members have overpaid for the Class Vehicles and been forced to pay other costs.

139.   Hence, Plaintiffs and the Nationwide and State Subclasses conferred a benefit on Ford, and it is inequitable for Ford to retain said benefit.

**B.      Claims Brought on Behalf of the Michigan Subclass**

### COUNT V

### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### (Mich. Comp. Laws § 445.903, *et seq.*)
### (Alleged by Plaintiff Neil Dorfman on Behalf of the Michigan Subclass)

140.   Plaintiff Dorfman re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

141.   Plaintiff Dorfman and the Michigan Subclass members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

142.   Ford is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

143.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably

believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

144.   Ford participated in misleading, false, or deceptive acts that violated the Michigan CPA as described below and alleged throughout the Complaint. By failing to disclose the Camera Defect, by concealing the Camera Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Camera Defect in the course of its business.

145.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

146.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business. Ford deceived a substantial portion of the purchasing public

and imposed a serious safety risk on the public through their sale or lease of Class Vehicles with the Camera Defect.

147. Ford knew that the Class Vehicles and their 360-degree cameras suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

148. Ford knew or should have known that its conduct violated the Michigan CPA.

149. Plaintiff Dorfman and the Michigan Subclass Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in their lease or purchase of the Class Vehicles.

150. Because Ford fraudulently concealed the Camera Defect, as well as the true nature of the Class Vehicles, Plaintiffs were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from this dangerous Defect. Had Plaintiff Dorfman and the Michigan Subclass Members known that the Class Vehicles would exhibit the Camera Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

151.    Ford owed Plaintiff Dorfman and the Michigan Subclass Members a duty to disclose the truth about the Camera Defect because Ford: possessed exclusive knowledge of the Class Vehicles and the Camera Defect; intentionally concealed the foregoing from Plaintiff Dorfman and the Michigan Subclass Members; and/or made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiff Dorfman and the Michigan Subclass Members that contradicted these representations.

152.    Due to Ford's specific and superior knowledge that the 360-degree cameras in the Class Vehicles will intermittingly fail due to the Camera Defect, its false representations regarding the safety of the Class Vehicles, and reliance by Plaintiff Dorfman and the Michigan Subclass Members on these material representations, Ford had a duty to disclose to Class members the Camera Defect. These omitted and concealed facts about the Camera Defect are material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff Dorfman and the Michigan Subclass Members and could not reasonably be known by the consumer. Safety is a material concern to Ford consumers. Ford represented to Plaintiff Dorfman and the Michigan Subclass Members that they were purchasing or leasing vehicles that were safe, when in fact it is only a matter of time before the 360-degree cameras fail due to the Camera Defect.

153.   As a result of GM's conduct, Plaintiff Dorfman and the Michigan Subclass Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

154.   As a result of Ford's conduct, Plaintiff Dorfman and the Michigan Subclass Members were harmed and suffered actual damages as a result of Ford's misrepresentations and omissions with regard to their Class Vehicles' 360-degree cameras because they purchased or leased vehicles which do not perform as advertised due to the Camera Defect.

155.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiff Dorfman and the Michigan Subclass Members suffered and will continue to suffer injury in fact and/or actual damages resulting from the Camera Defect.

156.   Ford's violations present a continuing risk to Plaintiff Dorfman and the Michigan Subclass Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest and safety.

157.   Plaintiff Dorfman and the Michigan Subclass Members seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages; reasonable attorneys' fees; and any other just and proper relief available under the Michigan CPA against Ford because it carried willfully and consciously disregarded the rights and safety of others.

**COUNT VI**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(Mich. Comp. Laws §§ 440.2314 and 440.2860)**

**(Alleged by Plaintiff Neil Dorfman on Behalf of the Michigan Subclass)**

158.   Plaintiff Dorfman re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

159.   Plaintiff Dorfman brings this cause of action on his own behalf and on behalf of the members of the Michigan Subclass

160.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

161.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

162.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

163.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mich. Comp. Laws §§ 440.2314 and 440.2862.

164.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles

equipped with the 360-degree Cameras to customers through authorized dealers, like those from whom Plaintiff Dorfman and the Michigan Subclass Members bought or leased their vehicles, for the intended purpose of consumers purchasing or leasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff Dorfman and the Michigan Subclass Members, with no modification to the defective 360-degree camera.

165.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

166.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 360-degree cameras that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable Class Vehicles; and (ii) a warranty that the Class Vehicles and their 360-degree cameras would be fit for their intended use while the Class Vehicles were being operated.

167.   Contrary to the applicable implied warranties, the Class Vehicles with their Camera Defect at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their 360-degree cameras and the

existence of the Camera Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

168.   As a result of Ford's breach of the applicable implied warranties, Plaintiff Dorfman and the Michigan Subclass Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Camera Defect, Plaintiff Dorfman and the Michigan Subclass Members were harmed and suffered actual damages in that the Class Vehicles' 360-degree camera components are defective, thus rendering the cameras repeatedly inoperative.

169.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Mich. Comp. Laws §§ 440.2314 and 440.2862.

170.   Plaintiff Dorfman and the Michigan Subclass Members have complied with their obligations under the warranty, sought the recommended software upgrades or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

171.   Plaintiff Dorfman and the Michigan Subclass Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Camera Defect from the complaints and service requests it

received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, through other internal sources, and through numerous complaints to NHTSA about the Camera Defect.

172. As a direct and proximate cause of Ford's breach, Plaintiff Dorfman and the Michigan Subclass Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles.

173. As a direct and proximate result of Ford's breach of the implied warranty of merchantability surrounding the Camera Defect, Plaintiff Dorfman and the Michigan Subclass Members have been damaged in an amount to be proven at trial.

## COUNT VII

## BREACH OF EXPRESS WARRANTY

### (Mich. Comp. Laws §§ 440.2313 and 440.2860)
### (Alleged by Plaintiff Neil Dorfman on Behalf of the Michigan Subclass)

174. Plaintiff Dorfman re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

175. Plaintiff Dorfman brings this cause of action on his own behalf and on behalf of the members of the Michigan Subclass

176.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

177.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

178.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

179.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW provides that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

180.   The Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their 360-degree cameras and the existence of the Camera Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

181.   Ford's warranties formed a basis of the bargain that was reached when Plaintiff and other Michigan Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

182.   Plaintiff and the Michigan Class members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to fix the defective components free of charge.

183.   Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

184.   Affording Ford a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. With 23S23, Ford now admits that there is now known repair for the Camera Defect, as "the remedy is under development. Root cause is unknown." Ford continues to fail to adequately recall and repair the Camera Defect in Class Vehicles despite the known safety risk and continued increase in the number of minor crashes reported.

185.   In July 2023, Plaintiffs, and members of the class received a Letter Notice of safety recall 23S23. Ford states in that letter that Ford currently "does not have a permanent fix available [for the Camera Defect.]"

186.   To date, Ford has not fixed the Camera Defect in Class Vehicles and offers no data indicating that the most recent "interim repair," suggested in Ford's July 2023 letter to Class Members, will actually repair the Defect. The Camera Defect has persisted in Class Vehicles since at least 2020, and Plaintiff and the Class continue to face safety risks through loss of rear camera image while in reverse increases the risk of a crash.

187.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Michigan Class members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

188.   Accordingly, recovery by Plaintiff and the other Michigan Class members are not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Michigan Class members, seek all remedies as allowed by law.

189.   Also, as alleged in more detail herein, at the time Ford warranted and sold or leased the Class Vehicles, Ford knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Ford had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.

190.   Plaintiff and the other Michigan Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

191.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Ford's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Michigan Class members' remedies would be insufficient to make Plaintiff and the other Michigan Class members whole.

192.   Finally, because of Ford's breach of warranty as set forth herein, Plaintiffs and the other Michigan Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the other Michigan Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

193.   Ford was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Ford publicly admitted to not having a remedy for the Camera Defect.

194.    As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Michigan Class members have been damaged in an amount to be determined at trial.

**C.    Claims Brought on Behalf of the California Subclass**

**COUNT VIII**

**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA")**

**(Cal. Civ. Code § 1750,** *et seq***.)**

**(Alleged by Plaintiff Travis Corby on Behalf of the California Subclass)**

195.    Plaintiff Corby re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

196.    Plaintiff Corby (for purposes of this section, "Plaintiff") brings this count on behalf of himself and the California Class.

197.    Plaintiff, the California Class members, and Ford are "persons" as that term is defined in Cal. Civil § 1761(c).

198.    Plaintiff and the California Class members are "consumers" as that term is defined in Cal Civ. Code §1761(d).

199.    Ford engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class members that the Class Vehicles suffer from Camera Defect(s)

(and the risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

- (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

- (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

- (a)(9) Advertising goods and services with the intent not to sell them as advertised.

200. Ford's unfair or deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

201. Ford knew that the Class Vehicles and 360 Camera Systems were defectively designed or manufactured, would malfunction, and were not suitable for their intended use.

202.    Ford was under a duty to Plaintiffs and the California Class members to disclose the defective nature of the Class Vehicles and the Camera Defect because:

a)    Ford was in a superior position to know the true state of facts about the Camera Defect in the Class Vehicles and the 360 Camera system, software updates and components;

b)    Plaintiff and the California Class members could not reasonably have been expected to learn or discover that the Class Vehicles had dangerous safety defect until manifestation of the defect;

c)    Ford knew that Plaintiffs and the California Class members could not reasonably have been expected to learn or discover the Camera Defect until the manifestation of the defect; and

d)    Ford actively concealed the safety issue posed by the Camera Defect by asserting to Plaintiffs and California Class members that a software update would address the issue, all while knowing there is no permanent repair to correct the Camera Defect.

203.   In failing to disclose the Camera Defect and the associated safety risks that result from it, Ford has knowingly and intentionally concealed material facts and breached their duty to disclose.

204.   The facts concealed or not disclosed by Ford to Plaintiff and the California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lesser price. Because Ford fraudulently concealed the Camera Defect, as well as the true nature of the Class Vehicles, Plaintiff Corby and the California Class were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from this dangerous Defect. Had Plaintiff Corby and the California Class members known about the defective nature of the Class Vehicles they would not have purchased or leased the Class Vehicles or would have paid less for them.

205.   Plaintiff Travis Corby provided Ford with notice of its violations of the CLRA pursuant to California Civil Code § 1782 contemporaneously with the filing of this Complaint, and currently seeks equitable relief. After the 30-day notice period expires, Plaintiff will amend this complaint to seek monetary damages under the CLRA.

206.   Plaintiff Corby and the other California Class members' injuries were proximately caused by Ford's fraudulent and deceptive business practices.

207.   Therefore, Plaintiff Corby and the other California Class members seek equitable relief under the CLRA.

## COUNT IX

## BREACH OF IMPLIED WARRANTY PURSUANT TO THE SONG-BEVERLY CONSUMER WARRANTY ACT

### (Cal. Civ. Code §§ 1792 and 1791.1, *et seq.*)

### (Alleged by Plaintiff Travis Corby on Behalf of the California Subclass)

208.   Plaintiff Corby re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

209.   Plaintiff Corby bring this cause of action on his own behalf and on behalf of the members of the California Subclass

210.   Plaintiff Plaintiffs and the California Subclass Members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

211.   Ford is and was at all relevant times a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

212.   The Class Vehicles are and were at all relevant times "are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

213.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Cal. Civ. Code §§ 1791.1(a) & 1792.

214.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the 360-degree cameras to customers through authorized dealers, like those from whom Plaintiff Corby and the California Subclass Members bought or leased their vehicles, for the intended purpose of consumers purchasing or leasing the vehicles.

215.   Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to California Plaintiffs and the California Subclass Members, with no modification to the defective transmissions.

216.   Ford provided Plaintiff Corby and California Subclass Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

217.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 360-degree cameras that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation with properly working cameras; and (ii) a warranty that the Class Vehicles and their 360-degree cameras would be fit for their intended use while the Class Vehicles were being operated.

218.   Contrary to the applicable implied warranties, the Class Vehicles and their 360-degree cameras at the time of sale and thereafter were not fit for their

ordinary and intended purpose of providing Plaintiffs and Class Members with safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their 360-degree cameras and the existence of the Camera Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

219.    As a result of Ford's breach of the applicable implied warranties, Plaintiff Corby and the California Subclass Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Camera Defect, Plaintiff Corby and the California Subclass Members were harmed and suffered actual damages in that the Class Vehicles' 360-degree camera components are defective, thus rendering the cameras repeatedly inoperative.

220.    Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

221.    Plaintiff Corby and the California Subclass Members have complied with all obligations under the warranty, sought the recommended software upgrades or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

222.    Plaintiff Corby and the California Subclass Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure

its breach of written warranty would have been futile. Ford was also on notice of the Camera Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or software updates of the 360-degree camera or components thereof, through complaints to NHTSA, and through other internal sources.

223.   As a direct and proximate cause of Ford's breach, Plaintiff Corby and the California Subclass Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles.

224.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Corby and the California Subclass Members have been damaged in an amount to be proven at trial.

## COUNT X

## BREACH OF EXPRESS WARRANTY

### (Cal. Com. Code §§ 2313 and 10210)

225.   Plaintiff Corby re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

226.   Plaintiff Corby brings this cause of action on his own behalf and on behalf of the members of the California Subclass.

227.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under California Commercial Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

228.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under California Commercial Code § 10103(a)(16).

229.    The Class Vehicles are and were at all relevant times "goods" within the meaning of California Commercial Code §§ 2105(1) and 10103(a)(8).

230.    In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW provides that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

231.    Ford provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Ford's warranties are express warranties under state law.

232.    The Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their 360-degree cameras and the existence of

the Camera Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

233.   Ford breached these warranties by selling and leasing Class Vehicles with the Camera Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

234.   Plaintiff Corby and the California Class members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to fix the defective components free of charge.

235.   Plaintiff Corby notified Ford of its breach within a reasonable time, and/or was not required to do so because affording Ford a reasonable opportunity to cure its breaches would have been futile. Ford also knew about the Camera Defect but chose instead to conceal its inability to correct the Camera Defect.

236.   As a direct and proximate cause of Ford's breach, Plaintiff Corby and the other California Subclass Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and the Class members have incurred and will continue to incur costs related to the Camera Defect's diagnosis and repair.

237.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitations are unenforceable because it knowingly sold a defective product without giving notice of the Camera Defect to Plaintiff Corby or the California Subclass.

238.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiff Corby and the California Subclass Members. Among other things, Plaintiff Corby and California Subclass Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and Plaintiff and the California Subclass Members because Ford knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

239.   Plaintiff and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct.

240.   Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

241.   Affording Ford a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. With 23S23, Ford now admits that there is now known repair for the Camera Defect, as "the remedy is under development. Root cause is unknown." Ford continues to fail to adequately recall and repair the Camera Defect in Class Vehicles despite the known safety risk and continued increase in the number of minor crashes reported.

242.   In July 2023, Plaintiff Corby and members of the California Subclass received a Letter Notice of safety recall 23S23. Ford states in that letter that Ford currently "does not have a permanent fix available [for the Camera Defect.]"

243.   To date, Ford has not fixed the Camera Defect in Class Vehicles and offers no data indicating that the most recent "interim repair," suggested in Ford's July 2023 letter to Class Members, will actually repair the Defect. The Camera Defect has persisted in Class Vehicles since at least 2020, and Plaintiff and the California Subclass continue to face safety risks through loss of rear camera image while in reverse increases the risk of a crash.

244.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Corby and the California Subclass Members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

245. Accordingly, recovery by Plaintiff Corby and the other California Subclass Members are not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other California Subclass Members, seek all remedies as allowed by law.

246. Also, as alleged in more detail herein, at the time Ford warranted and sold or leased the Class Vehicles, Ford knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Ford had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.

247. Plaintiff Corby and the other California Subclass Members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

248. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Ford's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other California Subclass Members' remedies would be insufficient to make Plaintiff and the other California Subclass Members whole.

249. Finally, because of Ford's breach of warranty as set forth herein, Plaintiff Corby and the other California Subclass Members assert, as additional

and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Corby and the other California Subclass Members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

250.   Ford was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Ford publicly admitted to not having a remedy for the Camera Defect.

251.   As a direct and proximate result of Ford's breach of express warranties, Plaintiff Corby and the other California Subclass Members have been damaged in an amount to be determined at trial.

**D.    Claims Brought on Behalf of the Kentucky Subclass**

**COUNT XI**

**BREACH OF IMPLIED WARRANTY**

**(Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212)**

**(Alleged by Plaintiffs Chad Hobson and Allen Davis on Behalf of the Kentucky Subclass)**

252.   Plaintiffs Hobson and Davis re-allege and incorporate by reference all paragraphs as though fully set forth herein.

253.   Plaintiffs Hobson and Davis bring this cause of action on behalf of themselves and on behalf of the members of the Kentucky Subclass.

75

254.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Kentucky Revised Statutes §§ 355.2-104(1) and 355.2A-103(3), and a "seller" of motor vehicles under § 355.2-103(1)(d).

255.   With respect to leases, Ford was and is at all relevant times a "lessor" of motor vehicles under Kentucky Revised Statutes § 355.2A-103(1)(p).

256.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kentucky Revised Statutes §§ 355.2-105(1) and 355.2A-103(1)(h).

257.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kentucky Revised Statutes §§ 335.2-314 and 355.2A-212.

258.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

259.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the 360-degree cameras to customers through authorized dealers, like those from whom Plaintiffs Hobson and Allen and the Kentucky Subclass Members bought or leased their vehicles, for the intended purpose of consumers purchasing or leasing the vehicles.

260.    Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiffs Hobson and Allen and the Kentucky Subclass Members, with no modification to the defective transmissions.

261.    Ford provided Plaintiffs Hobson and Allen and the Kentucky Subclass Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

262.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 360-degree cameras that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation with properly working cameras; and (ii) a warranty that the Class Vehicles and their 360-degree cameras would be fit for their intended use while the Class Vehicles were being operated.

263.    Contrary to the applicable implied warranties, the Class Vehicles and their 360-degree cameras at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs Hobson and Allen and the Kentucky Subclass Members with safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their 360-degree cameras and the existence of the Camera Defect at the time of sale

or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

264. As a result of Ford's breach of the applicable implied warranties, Plaintiffs Hobson and Allen and the Kentucky Subclass Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Camera Defect, Plaintiffs Hobson and Allen and the Kentucky Subclass Members were harmed and suffered actual damages in that the Class Vehicles' 360-degree camera components are defective, thus rendering the cameras repeatedly inoperative.

265. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

266. Plaintiffs Hobson and Allen and the Kentucky Subclass Members have complied with all obligations under the warranty, sought the recommended software upgrades or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

267. Plaintiffs Hobson and Allen and the Kentucky Subclass Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Camera Defect from the complaints and service requests it received from Plaintiffs Hobson and Allen and the Kentucky Subclass Members,

from repairs and/or software updates of the 360-degree camera or components thereof, through complaints to NHTSA, and through other internal sources.

268.   As a direct and proximate cause of Ford's breach, Plaintiffs Hobson and Allen and the Kentucky Subclass Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles.

269.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs Hobson and Allen and the Kentucky Subclass Members have been damaged in an amount to be proven at trial.

## COUNT XII

## BREACH OF EXPRESS WARRANTY

## (Ky. Rev. Stat. §§ 335.2-313 and 355.2A-210)

## (Alleged by Plaintiffs Chad Hobson and Allen Davis on Behalf of the Kentucky Subclass)

270.   Plaintiffs Hobson and Davis re-allege and incorporate by reference all paragraphs as though fully set forth herein.

271.   Plaintiffs Hobson and Davis bring this cause of action on behalf of themselves and on behalf of the members of the Kentucky Subclass.

272.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Kentucky Revised Statutes §§ 355.2-104(1) and 355.2A-103(3), and a "seller" of motor vehicles under § 355.2-103(1)(d).

273.   With respect to leases, Ford was and is at all relevant times a "lessor" of motor vehicles under Kentucky Revised Statutes § 355.2A-103(1)(p).

274.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kentucky Revised Statutes §§ 355.2-105(1) and 355.2A-103(1)(h).

275.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW provides that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

276.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Ford's warranties are express warranties under state law.

277.   The Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their 360-degree cameras and the existence of

the Camera Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

278.   Ford breached these warranties by selling and leasing Class Vehicles with the Camera Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

279.   Plaintiffs Hobson and Davis and the Kentucky Subclass Members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to fix the defective components free of charge.

280.   Plaintiffs Hobson and Davis and the Kentucky Subclass Members notified Ford of its breach within a reasonable time, and/or were not required to do so because affording Ford a reasonable opportunity to cure its breaches would have been futile. Ford also knew about the Camera Defect but chose instead to conceal its inability to correct the Camera Defect.

281.   As a direct and proximate cause of Ford's breach, Plaintiffs Hobson and Davis and the Kentucky Subclass Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs Hobson and Davis and the Kentucky Subclass Members have incurred and will continue to incur costs related to the Camera Defect's diagnosis and repair.

282.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitations are unenforceable because it knowingly sold a defective product without giving notice of the Camera Defect to Plaintiffs Hobson and Davis and the Kentucky Subclass.

283.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiffs Hobson and Davis and the Kentucky Subclass Members. Among other things, Plaintiffs Hobson and Davis and the Kentucky Subclass Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and Plaintiffs Hobson and Davis and the Kentucky Subclass Members because Ford knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

284.   Plaintiffs Hobson and Davis and the Kentucky Subclass Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct.

285.   Ford breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Ford

has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

286.   Affording Ford a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. With 23S23, Ford now admits that there is now known repair for the Camera Defect, as "the remedy is under development. Root cause is unknown." Ford continues to fail to adequately recall and repair the Camera Defect in Class Vehicles despite the known safety risk and continued increase in the number of minor crashes reported.

287.   In July 2023, Plaintiffs Hobson and Davis and the Kentucky Subclass Members received a Letter Notice of safety recall 23S23. Ford states in that letter that Ford currently "does not have a permanent fix available [for the Camera Defect.]"

288.   To date, Ford has not fixed the Camera Defect in Class Vehicles and offers no data indicating that the most recent "interim repair," suggested in Ford's July 2023 letter to Class Members, will actually repair the Defect. The Camera Defect has persisted in Class Vehicles since at least 2020, and Plaintiffs Hobson and Davis and the Kentucky Subclass continue to face safety risks through loss of rear camera image while in reverse increases the risk of a crash.

289.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is

insufficient to make Plaintiffs Hobson and Davis and the Kentucky Subclass Members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

290.   Accordingly, recovery by Plaintiffs Hobson and Davis and the Kentucky Subclass Members are not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs Hobson and Davis, individually and on behalf of the other Kentucky Subclass Members, seek all remedies as allowed by law.

291.   Also, as alleged in more detail herein, at the time Ford warranted and sold or leased the Class Vehicles, Ford knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Ford had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.

292.   Plaintiffs Hobson and Davis and the Kentucky Subclass Members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

293.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Ford's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation

on Plaintiffs Hobson and Davis's and the Kentucky Subclass Members' remedies would be insufficient to make Plaintiffs and the other Kentucky Subclass Members whole.

294.   Finally, because of Ford's breach of warranty as set forth herein, Plaintiffs Hobson and Davis and the Kentucky Subclass Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs Hobson and Davis and the Kentucky Subclass Members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

295.   Ford was provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Ford publicly admitted to not having a remedy for the Camera Defect.

296.   As a direct and proximate result of Ford's breach of express warranties, Plaintiffs Hobson and Davis and the Kentucky Subclass Members have been damaged in an amount to be determined at trial.

## VII   PRAYER FOR RELIEF

WHEREFORE, Plaintiff(s), on behalf of themselves and members of the Proposed Classes, respectfully request that this Court:

a) determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

b) appoint Plaintiffs as the representatives of the Nationwide and State-specific Subclasses and their counsel as Class counsel;

c) award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to whicfbh Plaintiff(s) and the Class members are entitled under the claims and causes of action as alleged above, at this time;

d) award pre-judgment and post-judgment interest on such monetary relief;

e) grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Ford to repair, recall, and/or replace the Camera Defect in Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class members with appropriate curative notice regarding the existence and cause of the Camera Defect;

f) award reasonable attorneys' fees and costs; and

g) grant such further relief that this Court deems appropriate.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Dated:  September 11, 2023          Respectfully submitted,

By: ___*/s/ E. Powell Miller*_____
      E. Powell Miller (P39487)
      Sharon Almonrode (P33938)
      Emily E. Hughes (P68724)
      Dennis A. Lienhardt (P81118)
      Mitchell Kendrick (P83705)
      **THE MILLER LAW FIRM, P.C.**
      950 W University Dr # 300,
      Rochester, Michigan 48307
      Telephone: (248) 841-2200
      epm@millerlawpc.com
      ssa@millerlawpc.com
      eeh@millerlawpc.com
      dal@millerlawpc.com
      mjk@millerlawpc.com

      Richard D. McCune
      David C. Wright
      Derek Y. Brandt
      Leigh M. Perica
      MCCUNE LAW GROUP
      3281 E. Guasti, Road, Suite 100
      Ontario, California 91761
      Telephone: (909) 557-1250
      Facsimile: (909) 557-1275
      rdm@mccunewright.com
      dcw@mccunewright.com
      dyb@mccunewright.com
      lmp@mccunewright.com

      *Attorneys for Plaintiffs and the Putative Class*